UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CECILIA SANOSSIAN,

                          Plaintiff,                    **REPORT AND
                                                        RECOMMENDATION**
              -against-                                 CV 16-4697 (JMA)(AYS)

VALLEY STREAM CENTRAL
HIGH SCHOOL DISTRICT,

                          Defendant.
-------------------------------------------------------------X
APPEARANCES:

THE ROTH LAW FIRM, PLLC
Attorneys for Plaintiff
BY: RICHARD A. ROTH, ESQ.
     STANISLAV SHAROVSKY, ESQ.
295 Madison Avenue, Floor 22
New York, New York 10007

SILVERMAN & ASSOCIATES
Attorneys for Defendants
BY: LEWIS R. SILVERMAN, ESQ.
445 Hamilton Avenue, Suite 1102
White Plains, New York 10601

**SHIELDS, Magistrate Judge:**

        This is an employment discrimination action commenced by Plaintiff Cecilia Sanossian

("Sanossian" or "Plaintiff") alleging that her former employer, Valley Stream Central High

School District, (the "District" the "School" or "Defendant") retaliated against her in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e., et seq ("Title VII"). See Amended

1

Complaint ("AC") dated November 9, 2020, Docket Entry ("DE") [88]. Presently before this Court, for Report and Recommendation is Defendant's motion for summary judgment.[1]

For the reasons set forth below, it is respectfully recommended that the motion be granted, and that Plaintiff's case be dismissed.

BACKGROUND

I.    Factual Background: Basis of Facts Recited Herein

The facts set forth below are drawn from the parties' statements of material facts submitted pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York. See DE [92], District's Rule 56.1 Statement ("Dist. R. 56.1"); DE [95], Plaintiff's Rule 56.1 Statement (P.'s R. 56.1") (collectively the "Rule 56.1 Statements"). The facts are undisputed unless otherwise noted. For ease of reference, and to avoid repetition where there is no factual dispute, the Court cites only to Plaintiff's Rule 56.1 statement. The Court also considers and refers to documents submitted by the District, which include full transcripts of depositions. These documents are annexed to the Declaration of Lewis Silverman, Esq., dated January 26, 2021 (the "Silverman Decl."). DE [91-24].[2]

II.    The Parties

Plaintiff began her employment with the District in 1994. After taking a leave of absence in 2015, Sanossian returned to the District in May of 2016 and remained there as a teacher until June of 2016. Deposition of Cecilia Sanossian ("Sanossian Dep.") at 17, DE [91-9]. She did not return to her teaching position until September of 2016 and began a childcare leave in January of

---

[1] Although the present motion for summary judgment was filed in April of 2021, it was referred, for report and recommendation, to the formerly assigned Magistrate Judge, before the motion was filed, on September 30, 2020.

[2] For ease of reference, page numbers for exhibits referenced herein are numbers assigned to pages on electronically filed documents, and not to the underlying documents themselves except for page numbers referenced in transcripts.

2017. Id. at 18. That leave was set to expire in June of 2019. Id. It appears that Sanossian has not returned to a teaching position. Id.

Valley Stream Central High School District is a public school district organized under the laws of the State of New York, and located in Nassau County. Dist. R. 56.1 at ¶ 5. In 2009, Plaintiff taught social studies at the North High School ("North"), a high school within the District, through the end of her employment with the District. Id. at ¶ 3. From 2009 to some time prior to 2014, Plaintiff served as the Chair of the social studies department at North. Id. at ¶ 4. She resigned from her position as Chair in 2014, but continued to teach at North until her 2017 leave. Id. at ¶¶ 3-4.

III.    Relevant Non-Parties

A.    District Administrators

Non-party Dr. Bill Heidenriech ("Heidenreich") was, during all times relevant hereto, the District's Superintendent of Schools. Dist. R. 56.1 at ¶ 6. Clifford Odell ("Odell") is the District Assistant Superintendent for Personnel and Administration, a position he has held since July 2015. Id. at ¶ 8. From 2005-2015, Odell served as the principal at North. Id. at ¶ 9. Mary Parisi ("Parisi") became the Chair of the social studies department at North after Plaintiff resigned from that position in 2014. Id. at ¶ 10. Parisi continues to serve as Chair. Id. at ¶ 11. Jennifer Buonaspina was, at all relevant times, the Assistant Principal at the District. Id. at ¶ 30.

B.    Teachers Who Complained of Harassment by Sanossian

John Brennan was a social studies teacher at the District along with Sanossian. In February of 2015, Brennan made a complaint to the District naming Sanossian as a sexual harasser. Id. at ¶ 36. In May-October 2015, ten other social studies teachers at North also made complaints to the District naming Sanossian as a sexual harasser. Id. at ¶¶ 48-50. The teachers

claiming sexual harassment in that complaint were Alphonso Daddino, Joseph Moniaci, James Green, Joseph Powers, Kevin Gilchrist, Daniel Ryan, Kathy Gray, Alisa Kovalsky, Catherine Norton, and Kelly Peckholdt.

IV.    Relevant Facts Regarding Plaintiff's Employment

The Court describes facts below that are relevant to Plaintiff's presently operative complaint. These facts are not in dispute. They detail Plaintiff's relationship with her co-workers and give background information to their claims of harassment by Sanossian. The Court also details the District's investigation of the teachers' complaints and its findings with respect thereto.

A.    Sanossian's 2010-2011 Relationship with Brennan and Daddino

As noted, John Brennan ("Brennan") was, at all relevant times, a social studies teacher at North and Sanossian's co-worker. In 2010, Brennan told Odell, the principal of North at the time, that he did not like or trust Sanossian. Dist. R. 56.1 at ¶ 17. At this meeting with Odell, Brennan said that Sanossian told Brennan a story about a "crazy college night" when she woke up in bed with a woman. Id. at ¶ 18. Thereafter, Odell had a conversation with Sanossian regarding this story.  Sanossian said the story was not sexual in nature. She does not characterize her conversation with Odell as any kind of directive regarding her behavior. Id. at ¶ 19.

Alphonse Daddino ("Daddino") was also, at all relevant times, a social studies teacher at North, and Sanossian's co-worker. Dist. R. 56.1 at ¶ 20. In 2011, while Sanossian was Chair of the social studies department, Daddino and Sanossian had a dispute regarding Daddino's yearly teaching goal. Id. Due to a death in his family, Daddino needed an extension of time and disputed the way in which the lesson should be taught. Id. at ¶ 21. Odell resolved the matter by giving Daddino the extension and explaining his responsibility to arrange for the lesson. Id. at ¶

4

22. At the same time, Daddino was upset that Sanossian referred to teacher Joe Powers (who taught at Sough High School - presumably another school in the District) as "trash." Id. at ¶ 23.

B.    Student Complaints Regarding Sanossian's Behavior Prior to 2015

At some point prior to 2015, Odell recalled that he received a complaint regarding Sanossian touching a student. Odell knew that an unnamed guidance counselor reported the complaint to him. While Odell does not recall the date of the complaint or the name of the student involved, the parties agree to the facts surrounding another incident involving a student and her parent. Specifically, in approximately 2013 or 2014, a parent named Valdez called Odell to complain about a matter regarding Sanossian that the parent heard from Powers. Valdez told Odell that Powers told her (Valdez) that Sanossian said that Valdez's daughter "looks at Mr. Powers 'like a hot fudge sundae.'" Dist. R. 56.1 at ¶ 26. Odell spoke to Sanossian about this incident. Sanossian denied the characterization of her statement saying that she had instead stated that the student "looks at Mr. Powell *like I look at a hot fudge sundae*." Valdez was nonetheless upset that anyone would think that her daughter would have behaved inappropriately. Id. at ¶ 27. Odell told Sanossian that her choice of description (presumably the reference to a hot fudge sundae) was inappropriate. Id. at ¶ 28.

In December of 2014 or January of 2015, two female students on Parisi's junior high school volleyball team told Parisi that Sanossian was "acting weird." Among other things said, they described Sanossian taking off her shoes and standing in a yoga position. They also said that Sanossian told too many personal stories and would, at times, hold their hands while answering questions. Dist. R. 56.1 at ¶ 29. Parisi raised these comments to Assistant Principal Jennifer Buonaspina ("Buonaspina") who instructed Parisi to speak with Sanossian. Id. at ¶ 30. Parisi spoke to Sanossian and explained that students had expressed concerns over touching and the

telling of personal stories - both issues that Sanossian should avoid. Id. at ¶ 31. Sanossian admits that these incidents were reported and that Parisi spoke to her about them. While she agrees that she was given "advice," Sanossian takes issue with referring to the conversation with Parisi as "counseling" and therefore denies the facts set forth in paragraph 31 of Defendant's Rule 56.1 Statement. Id. at ¶ 31. The Court finds that in some contexts, the use of the word "counsel" instead of "advise" might matter, but not here. Thus, Sanossian agrees that Parisi told her (or "advised" her) what to do, i.e., not to touch students or tell them personal stories, but argues that Parisi did not "counsel" her. Here, in the context of this 2014/2015 incident, and in the absence of any party attaching a particular contractual meaning to the words "advice" or "counsel," Plaintiff's Rule 56.1 denial by objecting to Defendant's use of the term "counsel" is a distinction without a difference. See https://www.merriam-webster.com/thesaurus/counseling (defining "counseling" as "to give advice and instruction to (someone) regarding the course or process to be followed."). Semantics aside, the key in this case is that all agree that the facts alleged refer to an incident that did, in fact, take place. This incident, like others, gives context to Defendant's actions with respect to Sanossian.

In January or February of 2015, the same two students who complained about Sanossian "acting weird" again approached Parisi. They reported that Sanossian was holding a marker in her hand as a reminder not to touch them. Dist. R. 56.1 at ¶ 32. Parisi again approached Assistant Principal Buonaspina who again told Parisi to speak with Sanossian. Parisi told Sanossian that the students were uncomfortable with her comments and believed that the use of the marker made a mockery of their original complaints. Id. at ¶ 33.

On approximately February 24, 2015, a student told Daddino that Sanossian sometimes "rubs students; shoulders or backs and that it was 'annoying' to him." Dist. R. 56.1 at ¶ 34.

Daddino made a report of this behavior on behalf of the student. Id. Parisi spoke with the student and Daddino. The student stated that Sanossian's conduct did not make him feel sexually harassed, but that it was annoying. Id. at ¶ 35.

        C.       <u>Brennan's February 2015 Complaint of Sexual Harassment by Sanossian</u>

On February 12, 2015, Brennan made a complaint of sexual harassment regarding Sanossian's conduct. Dist. R. 56.1 at ¶ 36. This complaint was made by Brennan's submission of a "Sexual Harassment Complaint Form." (The "Brennan Complaint"). Silverman Decl. Exh. F, DE [91-6]; Dist. R. 56.1 at ¶ 36. All agree that the Brennan Complaint was the first complaint of sexual harassment made to the District regarding Sanossian's conduct. Dist. R. 56.1 at ¶ 16. The Brennan Complaint states that Sanossian massaged Brennan's shoulder blades and neck after he stated that he did not want to be massaged. Silverman Decl. Exh. F; Dist. R. 56.1 at ¶ 37. It also states that, during Sanossian's first year as department head, Brennan reported to Odell that Sanossian's "excessive touching and inappropriate remarks" made him uncomfortable. Silverman Decl. Exh. F; Dist. R. 56.1 at ¶ 38.

Brennan identified Michele Puleo ("Puleo") as a witness to Sanossian's conduct. Silverman Decl. Exh. F; Dist. R. 56.1 at ¶ 38. Brennan stated that the District took no action in response to his earlier (pre-2015) complaint regarding Sanossian's conduct. He states that he spent the five years following the earlier complaint continuing to be touched by Sanossian. He "proceeded to avoid the office and any contact with her for five years." Silverman Decl. Exh. F.

        D.       <u>The District's Investigation of the Brennan Complaint: the 2015 Odell Memo</u>

The District, by then-North Principal Odell, investigated the Brennan Complaint. Odell summarized his investigation and transmitted his findings to the District Superintendent for Personnel Administration in a memorandum dated March 10, 2015 (the March 2015 Odell

7

Memo"). Silverman Decl. Exh. Q, DE [91-17]. The March 2015 Odell Memo details the

Brennan Complaint as well as statements made by Brennan during Odell's investigation.

First, the 2015 Odell Memo summarizes the facts as told to Odell by Brennan, witness Puleo,

and Sanossian. During his interview with Odell, Brennan stated that, on the same day that

Sanossian was massaging his shoulders and scalp, she was also acting in a bizarre manner toward

Puleo, who was in the same room. Silverman Decl. Exh. Q. Specifically, Brennan described

Sanossian braiding Puleo's hair (without asking) in an "almost caressing" manner. Id. Odell also

questioned Brennan about his claims of earlier objectionable conduct by Sanossian. Brennan

recounted several previous incidents involving Sanossian. Those incidents took place on four

occasions in 2011, eight occasions in 2012, three occasions in 2013, and once in 2014. Id. They

included Sanossian dressing so that her breasts were exposed, sitting with her legs

inappropriately open, with "her right leg spread out exposing her crotch," and "making her

underwear visible." Id. Brennan stated that Sanossian referred to using her looks when she was

"young and cute" which she could no longer do. Id. Brennan also told Odell of numerous

inappropriate remarks by Sanossian over the years including referring to a former teacher who

was offered a "blowjob" by the superintendent, saying a room was "like a bordello" when she

wasn't there, that the department had the most "FILFS" of all of the departments, offering her

apartment for him to shower before parent conferences, stating that her husband proposed to her

after they had sex in front of a fireplace, stating that when another teacher (Daddino) went to a

conference "it's like watching porn, the women throw themselves at him," and that Sanossian

repeatedly told the story about waking up in bed with a woman, and referred to herself while

stating "look at my ass . . . Not bad for a woman in her mid-40's." Id. Brennan also recounted

several incidents of unwelcome touching by Sanossian including rubbing against his body. Id.

Odell also interviewed Puleo. She stated that she had asked Sanossian to braid her hair and that she liked it. Silverman Decl. Exh. Q. Puleo witnessed the massaging of Brennan's back. She said that it lasted 8-10 seconds, and that Sanossian likely did not hear Brennan when he asked her to stop because she was talking. Id. Puleo said that the incident was "absolutely not" sexual in nature and that Sanossian (unlike herself and Brennan) is "touchy-freely." Id. Puleo also told Brennan that she did not want to pursue the situation any further and not to include her. Id. Other than the February 15, 2015 incident, Puleo said that she never observed Sanossian put her hands on Brennan or anyone else. Id.

Odell also met with Sanossian with respect to the Brennan Complaint. She stated that Puleo's recounting of the incident was accurate. Silverman Decl. Exh. Q. She either could not remember, or denied, all of the 2011-2014 incidents referred to by Brennan. Id. Sanossian also told Odell that she was contemplating pursuing a claim of defamation of character against Brennan, and of making a charge of a hostile work environment against the District. Id.

The 2015 Odell Memo summarizes the information above in its "Findings" section. It also states clearly that despite Brennan's report of inappropriate conduct dating back to 2011, Brennan "never previously reported to [Odell] that he was uncomfortable relative to inappropriate/unwanted touching or anything of a sexual harassment nature." Silverman Decl. Exh. Q The 2015 Odell Memo concludes that "[a]fter full consideration of all statements and the totality of the circumstances, there is insufficient evidence to find a violation of the Board policy." Id.[3] While the 2015 Odell Memo found no violation of District policy, it also includes

---

[3] The Board policy referred to is the District's policy against sexual harassment which states that "conduct is deemed to be sexual harassment when the recipient perceives such behavior as unwelcome . . . Sexual harassment is unwelcome conduct of a sexual nature, which can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature. Silverman Decl. Exh. Q.

Odell's recommendation "that Ms. Sanossian meet with both the building principal and assistant principal and be instructed to refrain from engaging in massaging or rubbing the backs, shoulders or unwanted physical contact of anyone with whom she comes in contact with in her capacity" as a District employee. Id.

E.     The March 12, 2015 Meeting with Sanossian

Odell states that on March 12, 2015 - two days after the March 10, 2015 Odell Memo - he had the meeting with Sanossian that was contemplated by his own recommendation. Silverman Decl. Exh. R, DE [91-18]. Odell informed Sanossian of the results of the investigation of the 2015 Brennan Complaint. During the meeting Odell directed Sanossian, in the presence of Buonaspina and Sanossian's union representative, "to refrain from making physical contact with her colleagues and/or students." Id.

Sanossian's Rule 56.1 statement provides that Exhibit R to the Silverman Declaration, which is relied on to support the date of the meeting between Odell and Sanossian, does not support the claim that a meeting took place. In support of this position, however, Sanossian, refers only to the third page of Exhibit R. The fourth page of that Exhibit does, indeed, support the factual assertion that the meeting with Sanossian took place on March 12, 2015. That assertion is also supported by the deposition transcript cited. That transcript is of Odell's deposition taken in Sanossian's state court defamation lawsuit against Brennan and Daddino. Contrary to Sanossian's denial of the District's assertion in paragraph 46 of its Rule 56.1 Statement, Odell does, in fact, refer to a meeting that he had with Sanossian. Silverman Decl. Exh. P at 116:24-25 - 117:1-5, DE [91-16]. In context, the meeting was held with respect to Brennan's February 2015 complaint, and Odell believed that a student was discussed at that meeting. While the testimony does not state the actual date of the meeting, there was no question

posed as to that date. In sum, the evidence put forward by the District supports Sanossian's factual assertion that Odell *told* Brennan that he *would* meet with Sanossian, and also fully supports that Odell *did*, *in fact*, meet with Sanossian following the February 2015 Brennan Complaint.

V.    <u>Sanossian Takes FMLA Leave from her Position at the District</u>

On April 20, 2015, Sanossian began a leave from her position at the District pursuant to the Family and Medical Leave Act ("FMLA"). Because it is not material to the present motion, the Court makes no findings as to the reasons for the leave. Sanossian returned to her teaching position at the District just short of one year later on May 16, 2016.

VI.    <u>2015 Complaints Made Regarding Plaintiff's Behavior</u>

The Court has already discussed the Brennan Complaint, which was made in February of 2015, investigated by the District in March of 2015, and found on March 10, 2015 to have involved no violation of District policy. The March 12, 2015 meeting with Odell followed. In May of 2015, ten other teachers (including one substitute teacher) made claims of sexual harassment against Sanossian. Nine of those teachers (six male and three female) were social studies teachers who signed on to a letter to Odell dated May 1, 2015 (the "May 2015 Letter"). Silverman Decl. Exh. C, DE [91-3]. The tenth teacher was a substitute teacher who was contacted in connection with the District's investigation of the May 2015 Letter. The nine teachers - who signed the May 2015 Letter as "Your concerned members of the North Social Studies Department" - were: (1) Joseph Moniaci ("Moniaci"); (2) Alphonso Daddino ("Daddino"); (3) James Green ("Green"); (4) Joseph Powers ("Powers"); (5) Kevin Gilchrist ("Gilchrist"); (6) Daniel Ryan ("Ryan"); (7) Kathy Gray ("Gray"); (8) Alisa Kovalsky ("Kovalsky") and (9) Catherine Norton ("Norton"). The tenth teacher who complained about

Sanossian, and who was interviewed in connection with the District investigation of the other claims against Sanossian, was substitute teacher Kelly Peckholdt ("Peckholdt").

The May 2015 Letter states that it was sent to inform Odell about the "unhealthy and hostile work environment" created by Sanossian at North. Silverman Decl. Exh. C. It further states that Sanossian's conduct took place while she served as Department Chair and continued thereafter. Id. The May 2015 Letter expresses the signers' beliefs that Sanossian may be pursuing litigation against one or more members of the department and that as "a department" they "would like the following statements to go on record." Id. Four categories of Sanossian's behavior are included in the May 2015 Letter. They are: (1) inappropriate, unwanted and unsolicited touching of staff; (2) unprofessional, demeaning, defaming and objectifying speech towards staff from the beginning of her tenure as chairperson to the present school year; (3) false accusations against members of the department; and (4) threats/inappropriate comments. Id.

The claims of unwarranted touching include the type of behavior set forth in the Brennan Complaint. Instances of unprofessional conduct include claims that Sanossian related personal sexual stories, referring to teachers as "FILF's (explained as an acronym for "fathers I would like to f**k"), and telling parents at back-to-school night that she had the best looking department. Silverman Decl. Exh. C. False accusations stated to have been made by Sanossian include accusing a member of the department of stealing money and other items. Id. Threats and inappropriate comments alleged to have been made by Sanossian include claiming that Odell would take revenge for her and preparing false forms that would harm teachers' careers. Id. Sanossian is also claimed to have publicly shared confidential information about teachers including miscarriages and hospitalizations. Id.

After setting forth information regarding Sanossian's conduct, the May 2015 letter

concludes that the teachers were writing because "in the past, [they] had hoped that these

inappropriate actions would simply stop. However, over time, the frequency, intensity, and

complexity of [Sanossian's] disturbing behavior became worse." Silverman Decl. Exh. C. The

signers of the May 15 Letter make clear that while not all members of the social studies

department had experienced the actions complained about, "those who have not directly

experienced these actions, have witnessed" them. Id.

VII.    Formal Allegations of Sexual Harassment by Sanossian Following the May 2015 Letter

    A.    Daddino and Brennan

On June 25, 2015, Daddino and Brennan sent the District an "intent to sue" letter "for

settlement purposes." A formal claim of sexual harassment was filed by them on August 3, 2015.

On August 24, 2015, Daddino and Brennan filed complaints of discrimination with the New

York State Division of Human Rights. Their complaint alleged the existence of a sexually hostile

environment based upon Sanossian's behavior. Daddino and Brennan discussed their claims at a

press conference.

    B.    Peckholdt

As part of the investigation of Sanossian, the District reached out to three former social

studies substitute teachers. Peckholdt was one of the three. Peckholdt's complaints about

Sanossian's behavior were part of the District's May 2015-December 2015 investigation. Her

claims also form the basis of a complaint of discrimination filed against the District by Peckholdt

on September 21, 2015.

    C.    Ryan and Gilchrist

Ryan and Gilchrist were two signatories to the May 1, 2015 Letter. They also filed formal complaints of discrimination against the District based upon Sanossian's conduct on September 24, 2015.

      D.    <u>Powers</u>

Powers was also a signatory to the May 1, 2015 Letter. He filed a formal complaint of discrimination against the District based upon Sanossian's conduct on October 6, 2015.

VIII.   <u>The December 2015 Report</u>

The complaints set forth in the May 2015 Letter, and those that surfaced following this letter, were investigated by the District. The District's findings appear in a document dated December 28, 2015, entitled "Report of Alleged Sexual Harassment" (the "December 2015 Report"). Silverman Decl. Exh. S, DE [91-19]. The December 2015 Report describes in great detail each claim of sexual harassment regarding Sanossian's conduct. It includes descriptions of all interviews held and the District's findings as to each complaint. In all, the December 2015 Report sets forth the District's findings with respect to each instance of sexual harassment by Sanossian alleged by the ten complainants. Certain instances were witnesses by only a single complainant, while others were witnessed by several.

      A.    <u>The Interviews</u>

The District interviewed the nine teachers who signed the May 2015 Letter between May 18 and May 29, 2015. Odell conducted these interviews in his office. North Assistant Principal Buonaspina attended most of the interviews. When Buonaspina could not attend, Parisi (who was then the North social studies department chair) attended. All teachers were given the opportunity to have a union representative present at their interviews. Most asked that Mr. DiSclafani, the building union representative, be in attendance. Since the initial interviews of the nine teachers

14

signing the May 2015 Letter were held prior to both the Daddino/Brennan claims and lawsuit, as well as the formal claims of harassment by Peckholdt, Ryan, Gilchrist and Powers, the District conducted follow-up interviews of these complainants after they filed their formal complaints of sexual harassment by Sanossian. Peckholdt, who filed a complaint of discrimination on September 21, 2015, was interviewed on October 9, 2015. In connection with its investigation of the several claims against Sanossian the District also interviewed Parisi, three other teachers and three students. The District also interviewed Sanossian.

Each of the nine teachers who signed the May 2015 Letter stated that they came forward because they believed that Sanossian was going to file a hostile environment claim against them. The May 2015 Letter was the first time any of its signatories complained about Sanossian's behavior. Brennan, who complained in February of 2015, did not sign on to the May 2015 Letter. None of the nine described Sanossian's behavior as sexual "or of a sexual harassment nature." However, they did describe Sanossian's behavior as "annoying, an invasion of personal space and/or bizarre." They also stated that Sanossian's behavior made them uncomfortable.

In all, the District investigated forty-two claims of sexual harassment against Sanossian. It conducted eighteen interviews (including Sanossian) over a time period spanning May-October of 2015.

B.    The Findings

The December 2015 Report contains detailed findings as to each of the complaints lodged against Sanossian. The forty-two claims were thoroughly investigated. All were deemed either not actionable under the District's sexual harassment policy or unsubstantiated. Many complaints against Sanossian referred to unwanted touching. In many instances, the District found that the touching did, in fact, take place. Many complaints were corroborated by multiple

witnesses. See e.g., Silverman Decl. Exh. S at Bates No. VSCHSD-586. In many instances, the District referred to Sanossian's comments as "unprofessional." Moreover, the District acknowledged that Sanossian's touching made the complainants uncomfortable. However, it also found that Sanossian's comments and touching did not amount to a violation of the District's policy against sexual harassment. See e.g., Silverman Decl. Exh. S at Bates No. VSCHSD-586. Therefore, the claims were found to be unsubstantiated.

It is important to note that the District uses the word "unsubstantiated" in a general way to include claims that were found unsubstantiated because they were not reported at the time of the conduct, as well as claims that did not rise to the level of a violation of the District's policy. With respect to the latter class of claims, the District repeatedly found that "Sanossian *did touch* certain staff members who have now reported that this touching made them uncomfortable. However, the touching was not sexual in nature." Silverman Decl. Exh. S at Bates No. VSCHSD-589 (emphasis added). Therefore, the touching did not amount to a violation of the District's sexual harassment policy. Odell concluded the December 2015 Report by stating that its findings would be referred to Heidenreich, the District Superintendent of Schools.

Notably, it was nowhere found within the District's extensive 2015 report that any of the claims against Sanossian were fabricated, or that any claim was made with malice against her. Nor was it found that the nine teachers who signed on to the May 1, 2015 Letter were motivated to complain about Sanossian only as a measure of support for Brennan's 2015 complaint.

IX.     The January 4, 2016 Letters Advising Complainants and Sanossian of Findings

On January 4, 2016, the District sent letters to Sanossian and to each of the complainants who asserted claims of sexual harassment against her (the "January 2016 Letters"). Silverman Decl., Exh. T, DE [91-20]. Those letters were signed by Odell and state that he performed an

investigation as to the complainant's allegations. The January 2016 Letters conclude that "certain of the alleged actions are not actionable under the District's policy and regulation and other alleged actions which would be actionable under the District's policy and regulation were unsubstantiated or did not rise to the level of sexual harassment." Id. Accordingly, Odell found that "I do not find a violation of the District's sexual harassment policy and regulation." Id. The January 2016 Letters went on to state that "retaliation in any form, by you, or a third party acting on your behalf, is strictly prohibited by law and District Policy." Id. Recipients were "encouraged to report any additional conduct [they] feel is a violation of this Policy to [Odell] or to a appropriate supervisor." Id. Finally, the January 2016 Letters advised recipients that "any party who is not satisfied with the outcome of [the] investigation may submit an appeal to Dr. Heidenreich, the Superintendent of Schools, within thirty (30) days." Id.

X.    Sanossian's 2016 EEOC Complaint

On February 23, 2016, approximately seven weeks after the January 4, 2016 Letters, Sanossian filed a complaint of Title VII sex discrimination with the EEOC (the "EEOC Complaint"). Silverman Decl. Exh. H, DE [91-8]. The EEOC Complaint annexes an appendix setting forth Sanossian's complaints. The appendix states that since 2014, she was the target of "an ongoing pattern of hostile behavior by her fellow co-workers and members of the Social Studies Department at Valley Stream North." Id.  In particular, the EEOC Complaint details facts of alleged discrimination during 2014 and 2015. Among the actions alleged in Sanossian's hostile environment claim are the 2014 removal of classroom items by Powers and discarding them or taking them into his classroom, berating Sanossian for stepping down as department chair, and Daddino's 2014 removal of a desk from Sanossian's classroom and leaving her belongings outside of her classroom. Id. Sanossian also refers to co-worker claims of sexual

17

harassment by Sanossian, including the Brennan Complaint, the 2015 failure of the male members of the social studies department to communicate with Sanossian (in an act of solidarity with Brennan), Brennan and Daddino's instigation of a May 2015 complaint of sexual harassment against Sanossian (a reference to the May 2015 Letter) and an October 2015 claim of sexual harassment filed by other male members of the social studies department (apparent references to the formal claims of harassment filed by teachers while the District was investigating the May 2015 Letter). Id. Brennan and Daddino are named in the EEOC Complaint as the teachers "responsible for organizing the false and defamatory complaints" set forth in the May 2015 Letter. Id.

Sanossian's EEOC Complaint characterizes the sexual harassment complaints against her as false and made in retaliation for Sanossian's hostile environment complaints. Silverman Decl. Exh. H. Apparently relying on the December 2015 Report, Sanossian states that despite her exoneration of all charges of sexual harassment, the District failed to take any action against her accusers. See Silverman Decl. Exh. H at 11 (noting that "no actions have been taken to discipline the signatories to the May 2015 letter"). Thus, in her EEOC Complaint, Sanossian faults the District for failing to discipline the ten teachers who made complaints about her harassment.

On May 6, 2016, the EEOC forwarded Sanossian's complaint to the District under cover of a "Notice of a Charge of Discrimination." The District received this notice, and therefore, first received notice of Sanossian's EEOC Complaint on May 13, 2016. The notice is date stamped and there is no reason to believe that the stamp reflects anything other than the date of receipt. Three days later, on May 16, 2016, Sanossian returned from her FMLA leave.

On May 31, 2016, the EEOC issued Sanossian a right to sue letter. That letter reflects the EEOC's determination that it was unable to conclude that Sanossian's information established a

18

violation of any equal employment statute. The District received the Right to Sue Letter on June 3, 2016.

XI.    The June 7, 2016, Counseling Memo

On June 7, 2016, after her May 16, 2016 return to the District, Sanossian met with Odell. See Silverman Decl. Exh. U, DE [91-21]. Odell wrote to Sanossian in a letter of the same date. That letter is the sole employment act that Plaintiff claims in this retaliation lawsuit. The Court refers to the letter as the "2016 Memo." The 2016 Memo summarizes the June 7, 2016 meeting with Odell, as well as their October 19, 2015 meeting. The latter meeting was held as part of the District's investigation of the several claims against Sanossian. The June 2016 Counseling Memo states that during their meeting, Odell spoke with Sanossian about the complaints made against her that were investigated by the District. Those complaints - which are detailed in the December 2015 Report - were made on or about May 1, August 5, September 24, September 29, and October 6 of 2015. As noted, Sanossian met with the District to discuss those complaints on October 19, 2015. The October 2015 meeting and each complaint made took place while Sanossian was on leave and before she made the EEOC Complaint. Odell states that, during the October 19, 2015 meeting with Sanossian, she "generally denied engaging in the activities described" but that she "admitted to occasionally discussing inappropriate matters, using inappropriate terms to refer to … co-workers, and touching a co-worker in the course of carrying out [her] duties." In addition, the 2016 Memo notes that Sanossian "admitted that [she] previously had touched students on the arms, shoulders, or upper backs" and that she was "advised against doing so." The 2016 Memo notes that Sanossian "explained that [she] began using a dry-erase marker as a reminder not to touch students."

19

The 2016 Memo refers to Sanossian's conduct as a "severe lapse in judgment." It states that she should understand that "interactions between [Sanossian] and staff should always be professional respectful, and pleasant." Sanossian was advised that "[f]urther evidence of your inappropriate exchanges with students/staff will not be tolerated and will result in disciplinary action including the possibility of termination." Odell also described in the 2016 Memo that he and Sanossian discussed the importance of her "communicating appropriately with co-workers, students, and parents at all times, refraining from discussing sexual activities with co-workers, students and parents and refraining from touching co-workers, students, and parents."

To help Sanossian avoid problems of the nature discussed, Odell directed Sanossian to comply with a particular list of behaviors. Each behavior is related to directing Sanossian to engage in appropriate behavior with co-workers, students, and teachers, and to avoid the type of inappropriate language and touching that constituted the unprofessional behavior that was investigated by the District 2015.

<u>PRIOR PROCEEDINGS</u>

I.     <u>The Original Complaint and Motion Practice</u>

Plaintiff's first complaint was filed on August 23, 2016. That pleading, which named Brennan, Daddino, and the District as defendants, was the subject of motion practice which included March 2017 motions to dismiss. DE [26]; [31]. Those motions were referred to the Honorable A. Kathleen Tomlinson, the formerly assigned Magistrate Judge, in October 2017. That referral resulted in a Report and Recommendation dated February 2018 (the "2018 R&R"). DE [38]. The 2018 R&R dismissed the claims against individual Defendants Brennan and Daddino as well as all claims against the District. It was recommended, however, that Plaintiff be given leave to re-plead her claims against the District. The District Court adopted that Report and

20

Recommendation, over objections, on March 31, 2018. DE [46].  In accord therewith, Brennan and Daddino were dismissed as defendants herein. See DE [74], [75]. Discovery followed.[4]

In March of 2019, Plaintiff moved to amend her complaint to allege only claims for retaliation arising from a single, previously dismissed incident – the June 7, 2016 Memo. DE [68]. On February 19, 2020, noting that the motion was still pending even though discovery was complete, the District sought to move for summary judgment. DE [84]. The motion to amend was thereafter granted on October 29, 2020. DE [86]; Sanossian v. Valley Stream Central High Sch. Dist., CV 16-4697 (JMA) (AKT), 2020 WL 6385602 (E.D.N.Y. Oct. 29, 2020). On November 9, 2020, Plaintiff filed the Amended Complaint. DE [88].

The District Court referred the pre-motion conference regarding the request to move for summary judgment to the previously assigned Magistrate Judge, along with any motion arising therefrom. See Electronic Order of Azrack, D.J., dated September 30, 2020; DE [87].

## THE AMENDED COMPLAINT AND THE MOTION FOR SUMMARY JUDGMENT

II.     The Amended Complaint

The operative complaint herein is Plaintiff's amended complaint filed on November 9, 2020 (the "Amended Complaint"). DE [88]. The Amended Complaint sets forth a single cause of action for Title VII retaliation. Id.[5]

The sole adverse action alleged in support of Plaintiff's claim of retaliation is the June 2016 Counseling Memo. Silverman Decl. Exh. U; Silverman Decl. at ¶ 21. Plaintiff alleges that the June Memo was an adverse employment action taken in retaliation for her EEOC Complaint.

---

[4] Discovery in this matter was consolidated with discovery in an earlier case filed by Brennan and Daddino against the District under docket number 16-cv-663. The cases were consolidated only for purposes of discovery.

[5] By stipulation dated November 22, 2016, which was so ordered on December 19, 2016, Sanossian withdrew her NYSHRL claim with prejudice.

III.     The Motion for Summary Judgment

As noted, although the present motion for summary judgment was filed in April of 2021, it was referred, for Report and Recommendation, to the formerly assigned Magistrate Judge, before the motion was filed on September 30, 2020.

Defendant argues that it is entitled to summary judgment because Plaintiff can show neither adverse action nor causation. Specifically, Defendant contends that the 2016 Memo does not amount to a materially adverse action within the meaning of a Title VII prima facie case of retaliation. Defendant further argues that even if the 2016 Memo does indeed allow a reasonable jury to find material adverse employment action, Plaintiff cannot show, as a matter of law, that the issuance of the 2016 Memo is causally related to the claimed protected activity, i.e., EEOC Complaint.

Having summarized the facts and the parties' positions, the Court turns to the merits of the motion.

DISCUSSION

I.     Legal Principles: Standards on Summary Judgment

Summary judgment is appropriately granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009). A fact is "material" if it might affect the outcome of the litigation under the relevant law. Id. The party moving for summary judgment is first responsible for demonstrating the absence of

any genuine issue of material fact. Celotex, 477 U.S. at 322. Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002) (quoting Celotex, 477 U.S. at 322).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all reasonable inferences against the moving party". Tolbert v. Smith, No. 14-1012-cv., 2015 WL 3875237, at *4 (2d Cir. June 24, 2015); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise, Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995), and must do more than show that there is "some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Instead, the non-moving party must "set forth significant, probative evidence on which a reasonable fact-finder could decide" in her favor. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256–57 (1986).

While the Second Circuit often notes that caution should be employed when deciding whether to grant summary judgment in cases where an employer's intent is at issue, the court has noted similarly that "the salutary purposes of summary judgment-avoiding protracted and harassing trials-apply no less to discrimination cases than to ... other areas of litigation." Tolbert, 2015 WL 3875237 at *4; see also Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) (summary judgment appropriate to avoid "protracted, expensive and harassing trials"); Abdu–Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases"); Kohutka v. Town of Hempstead, 994 F. Supp. 2d 305, 316 (E.D.N.Y. 2014).

II.    Retaliation: *McDonnell Douglas* Framework

Title VII "makes it unlawful for an employer to retaliate against an individual because she 'opposed any practice' made unlawful by Title VII." 42 U.S.C.A. § 2000e-3; Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 567 (2d Cir. 2011). Retaliation claims are analyzed under the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005); Livingston v. Roosevelt Union Free Sch. Dist., 17-CV-4189 (JMA)(SIL), 2020 WL 1172642, at * 6 (E.D.N.Y. Jan. 15, 2020). Under this framework, the plaintiff must first establish a prima facie case of retaliation "after which the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." Livingston, 2020 WL 1172642, at * 6; Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008)). "Once the defendant provides such a reason, the burden shifts back to the plaintiff to present competent evidence that the reasons offered by the defendants were not the true reasons, but were a pretext for ... retaliation."

A prima facie case of retaliation is satisfied by showing that: (1) the plaintiff was engaged in protected activity; (2) the defendant was aware of the protected activity; (3) the plaintiff suffered a materially adverse action; and (4) that there is a causal connection between the protected activity and the material adverse action. Zeng v. New York City Housig Auth., 18 Civ. 12008 (AKH), 2022 WL 37131, at * 10 (S.D.N.Y. Jan. 3, 2022); Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 14 (2d Cir. 2014); Ruiz v. County of Rockland, 609 F.3d 486, 491–92 (2d Cir. 2010); Leibowitz v. Cornell University, 584 F.3d 487, 498 (2d Cir. 2009); Fuentes v. Cablevision Sys., Corp., 14-CV-32 (RRM) (CLP), 2016 WL 4995075, at *5 (E.D.N.Y. Sept. 19, 2016); Filippi v. Elmont Union Free School Dist. Bd. of Educ., No. 09-cv-4675 (JFB)(ARL), 2012 WL 4483046, at *9-10 (E.D.N.Y. Sept. 27, 2012).

The Second Circuit has explained that a plaintiff's prima facie burden is de minimis. Abdu–Brisson, 239 F.3d at 467. If the plaintiff meets the initial burden, a "presumption of retaliation" arises. This presumption may be rebutted by the articulation of a "legitimate, non-retaliatory reason for the adverse employment action." Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 70 (2d Cir. 2015). Like the plaintiff's prima facie burden, the defendant's burden of showing legitimate non-discriminatory reasons is similarly "light." Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998). Thus, a defendant is required only to "articulate an explanation that, if true, would connote lawful behavior." Id. "The burden is one of production, not persuasion." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000), quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).

When a defendant shows a sufficient non-discriminatory reason for its action, the presumption of retaliation "drops from the case." Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 255, n. 10 (1981), and the burden shifts back to the plaintiff to "to demonstrate by competent evidence" that the reasons offered were "a pretext for discrimination." Id. Thus, at that point, the plaintiff "is given an opportunity to adduce admissible evidence that would be sufficient to permit a rational finder of fact to infer that the employer's proffered reason is pretext for an impermissible motivation." Vivenzio, 611 F.3d at 106, quoting Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000).

In Title VII cases, the plaintiff has the burden to prove that retaliation was the "but-for" cause of the adverse employment action. Such "but-for" causation "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Zann Kwan, 737 F.3d at 845, quoting Nassar, 570 U.S. at 360; Amaya v. Ballyshear LLC, 295 F. Supp. 3d 204, 222 (E.D.N.Y. 2018). The ultimate burden of

25

persuasion as to whether there was intentional discrimination "remains at all times with the plaintiff." Burdine, 450 U.S. at 253.

In the final summary judgment analysis, the court must consider all evidence properly presented, and "examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer." Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001).

III.   Disposition of the Motion: Application of *McDonnell Douglas*

    A.   Plaintiff's *Prima Facie* Case

The filing of a complaint to the EEOC is activity protected by Title VII. See Jaeger v. N. Babylon Union Free Sch. Dist., 191 F. Supp. 3d 215, 232 (E.D.N.Y. 2016). Since the District received the EEOC Complaint on May 13, 2016 and the 2016 Memo is dated June 2016, the Court finds that the District was aware of the EEOC Complaint. However, as discussed below, the fact that the date upon which the District became aware of the EEOC Complaint precedes the 2016 Memo does not lead to an automatic finding of causation. It is sufficient, however, to show that the District was "aware" of Plaintiff's protected activity for the purposes of showing a prima facie case. The Court turns to consider the elements of Plaintiff's prima facie claim of retaliation that are at issue and dispositive of the pending motion: (1) whether Plaintiff suffered a materially adverse employment action and (2) whether that action was causally related to her protected activity.

    i.   Adverse Employment Action

In the retaliation context, a materially adverse employment action is an action that is "harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination." Shultz v. Congregation Shearith Israel of N.Y., 867 F.3d 298, 309

(2d Cir. 2017) (internal quotation marks omitted). The standard to determine whether an action is materially adverse is objective, but "[c]ontext matters." Burlington N. and Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2416 (2006); Hicks v. Baines, 593 F.3d at 165. As to objectivity, the court focuses on the "reactions of a reasonable employee" and not a plaintiff's "unusual subjective feelings" when judging harm. White, 126 U.S. at 2416; see Tepperwein, 663 F.3d at 568. The "significance of any given act of retaliation will often depend upon the particular circumstances." White, 126 S. Ct. at 2415. As set forth by the Supreme Court, the "real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." White, 126 S. Ct. at 2215 (citation omitted). "By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position," this standard "screen[s] out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." Id.; see also Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 227 (2d Cir. 2006). Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even seemingly "trivial acts" may, under certain circumstances, "take on greater significance when they are viewed as part of a larger course of conduct." Tepperwein, 663 F.3d at 568.

Here, the sole act of alleged retaliation is the 2016 Memo could dissuade a reasonable employee from making a claim of discrimination. Many courts have considered whether "counseling" memoranda can constitute adverse action in a case alleging retaliation. While such documents may amount to retaliation in certain circumstances, their issuance certainly does not always constitute retaliation. Indeed, even when added to other facts, a counseling memo may not constitute material adverse action in support of a prima facie case of retaliation. See e.g.,

Tepperwein, 663 F.3d at 568-70 (nine employment acts, including a counseling memo do not amount to adverse employment action in case alleging retaliation); Mitchell v. SUNY Upstate Med. Univ., 243 F. Supp. 3d 255, 280 (N.D.N.Y. 2017) (counseling memo along with two disciplinary actions did not constitute materially adverse action in case alleging retaliation); Eustache v. Home Depot USA, Inc., No. 13-CV-42L (SJF)(AKT), 2014 WL 4374588, at *33 (E.D.N.Y. Sept. 2, 2014) (counseling memo does not amount to retaliation in case alleging retaliation); but see St. Juste v. Metro Plus Health Plan, 8 F. Supp. 3d 287, 326-27 (E.D.N.Y. 2014) (counseling memo which could be first step in disciplinary process held to satisfy adverse employment action in case alleging retaliation); Oliver v. New York State Police, 1:15-cv-00444 (BKS/DJS), 2020 WL 1989180, at *39 (N.D.N.Y. Apr. 27, 2020) (counseling memo which "disparaged" the reputation" of another individual and brought "discredit to our organization" held to satisfy adverse employment action in case alleging retaliation).

While courts have reached different results regarding whether a counseling memorandum constitutes an adverse action that would dissuade a reasonable worker from engaging in protected activity, a review of caselaw reveals that such findings are fact-specific. Thus, a review of cases referencing counseling memoranda reveals that the answer to the question of whether the issuance of such documents constitutes adverse action is simply, "it depends" – on the facts of the case. Still, the factual nature of the question itself does not necessarily preclude summary judgment. The question on summary judgment is whether the issuance of the document (and not any document bearing a "counseling" label), under the facts of the case presented, would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." White, 548 U.S. at 68. If, under the circumstances of the case, the document would have dissuaded the making of a charge of discrimination, issuance thereof can support a claim of retaliation. If not, it

does not. Under the facts of this case, the Court holds that the 2016 Memo does not, as a matter of law, constitute a material adverse employment action sufficient to support Plaintiff's claim of retaliation.

Plaintiff contends that the counseling memorandum constitutes an adverse employment action because it "became a permanent fixture in her personnel file and could be used as evidence in a later disciplinary proceeding, up to and including termination." Plaintiff's Memorandum of Law in Opposition to Defendant's Summary Judgment Motion ("Pl's Mem.") at 4, DE [94]. Plaintiff "viewed the issuance of the counseling [sic] as an intimidation tactic." Id. This assertion is insufficient to support Plaintiff's claim of materiality. The prospective ramifications and subjective concern regarding the consequences of being issued a counseling memorandum, without supporting evidence, is insufficient to raise an issue of fact on whether the memorandum amounted to an adverse employment action. See Carmellino v. District 20 of New York City Dept. of Educ., No. 03 Civ. 5942 PKC, 2006 WL 2583019, at *48 (S.D.N.Y. Sept. 6, 2006) (rejecting the plaintiff's argument that negative letters placed in her file constituted an adverse employment action since they created a permanent record that, according to her belief, would prevent another school from hiring her).

Materiality matters, even in the context of a claim for retaliation, where the standard is lower than in Title VII claims of direct discrimination. Facts revealed in discovery show that the materiality of the 2016 Memo is minimal. The 2016 Memo itself goes to great lengths to detail that it did not constitute discipline of any kind. It was placed in Plaintiff's file to counsel her as to how to behave properly. While made a part of Sanossian's file, the 2016 Memo makes clear the findings of the District regarding claims made by Sanossian's co-workers, and counsels Sanossian as to the importance of appropriate behavior. It states the District's willingness to

assist Sanossian in avoiding certain behavior and encourages her to discuss any issues relating to future conduct with her Principal. While the 2016 Memo warns Sanossian of the consequences of any future lapses in conduct, it clearly states that "the purpose of" the memo is "to instruct you as to how to avoid such problems in the future." It also states that while future disciplinary formal action could happen, that the memo "should not be construed as a formal accusation, charge, or formal disciplinary action." There is no reason not to take the District at its word. Sanossian was asked to sign the 2016 Memo. The 2016 Memo states her right to submit a formal written response to be placed in her file. She neither signed the memo, nor submitted any written response thereto. Considering the facts, this case falls squarely within the general precept that an employer's "enforcement of its preexisting disciplinary policies in a reasonable manner" does not amount to a materially adverse action." Mitchell, 243 F. Supp. 3d at 280, quoting, Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 26 (2d Cir. 2014).

Additionally, acceptance of Sanossian's adverse action argument requires the Court to reach a decision completely inconsistent with the intent of anti-retaliation rules. Thus, Plaintiff would have the Court rule that a reasonable employee, who has been the subject of an investigation arising out of several co-workers' claims of sexual harassment, would be dissuaded from making her own claim of sexual harassment, *based upon the same claims already under investigation* - if she thought that such claim would result in a letter to her file. The employee in this scenario is already part of an investigation that she knows will result in some sort of a written finding – either that she had sexually harassed others in violation of her employer's policy, that she did not, or something in between. Such an employee must reasonably know that some document detailing the outcome of the investigation would be put in her file. Indeed, in light of the accusations and the chorus of workers who made them with unanimity, it is

30

reasonable to believe that a letter placed in Plaintiff's file would be imminent, whether Sanossian later made an EEOC claim or not.

It is important to emphasize the irony of accepting Plaintiff's argument as to what the District should have done to satisfy her claim. Sanossian's EEOC Complaint is based on the notion that the District discriminated against her by not disciplining her accusers. In her scenario, employees who make claims of sexual harassment which are later found to be unsubstantiated should be disciplined for making claims of harassment. Acceptance of this argument would certainly dissuade as reasonable employee from making any claim of discrimination, which is exactly the opposite of the intent of sexual harassment anti-retaliation laws.

Putting such counseling memos in the files of her accusers, as Plaintiff would have the District do, would require all accusers to be told that, in the future, they should not complain about harassment that is close to, but may not actually, violate the District's sexual harassment policy. Such employees should be encouraged to come forward with charges of inappropriate behavior - not disciplined for doing so. It is important to remember that the District's investigation nowhere found that Plaintiff's accusers acted with malice or fabricated stories of harassment. At most, it found that the complaints were made too late and/or that while Sanossian's conduct was unprofessional, it did not violate the District's sexual harassment policy. The placing of counseling letters in the files of accusers does not foster any notion of "equal treatment." Instead, it is an actual adverse action that might dissuade employees from complaining about sexual harassment. In sum, under the facts here, the 2016 Memo does not amount to adverse action in support of a prima facie case of retaliation. The specter of a counseling memo does not loom so large as to have dissuaded a reasonable employee under

31

Sanossian's circumstances from filing a claim of harassment based upon the same facts underlying her co-workers' claims of sexual harassment.

The Court is well aware that Plaintiff's claim that the 2016 Memo was previously analyzed in the context of a motion to dismiss. There, Magistrate Judge Tomlinson found that issuance of the Memo stated a plausible claim of adverse action. Plaintiff makes much of this finding, arguing that the Court has already held that the 2016 Memo is adverse action. Any prior finding on this issue, however, is not binding here, in the context of a motion for summary judgment. After discovery, a claim that passed the plausibility standard on a motion to dismiss may not stand up to the standard for showing a prima facie case of discrimination. Thus, while Magistrate Judge Tomlinson utilized the prima facie elements of Plaintiff's claim as "guideposts," see DE [38] at 38, those guideposts are now set in stone in the context of the present motion for summary judgment. They have not been met.

Even if the Court were to accept that the 2016 Memo constituted adverse employment action – which it does not – the Court would nonetheless recommend that the motion for summary judgment be granted on the ground that Plaintiff cannot satisfy the element of causation. As discussed below, no reasonable jury could find that issuance of the 2016 Memo was causally related to Plaintiff's EEOC Complaint.

 ii. <u>Causation</u>

<u>Timeline of Events Regarding Sanossian's EEOC Complaint</u>

In support of her claim of causation Plaintiff places great weight on the timeline between the filing of her EEOC Complaint, the District's knowledge thereof, and the issuance of the 2016 Memo. The Court therefore sets forth with clarity those dates and notes whether they reflect the District's knowledge of the EEOC Complaint over a 25-day period:

- February 23, 2016:

   Plaintiff files the EEOC Complaint

- May 6, 2016:

   The EEOC "Notice of Discrimination" is sent to the District

- Friday May 13, 2016:

   The District Received the EEOC Notice of Discrimination

- Monday May 16, 2016:

   Sanossian returns from FMLA leave

- Tuesday May 31, 2016:

   The EEOC issues Sanossian's Right to Sue Letter

- Friday June 3, 2016:

   The District receives the Right to Sue Letter

- Tuesday June 7, 2016:

   The District issues the 2016 Memo

Causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff. Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010); Barella v. Village of Freeport, 16 F. Supp. 3d 144, 158 (E.D.N.Y. 2014); Sotomayor v. City of New York, 862 F. Supp. 2d 226, 251 (E.D.N.Y. 2012); Flaherty v. Massapequa Public Schools, 752 F. Supp. 2d 286, 295–96 (E.D.N.Y. 2010), aff'd., 462 F. App'x. 38 (2d Cir. 2012).

The facts recited above shift the burden on this motion to Plaintiff to show that the reasons offered for the 2016 Memo were a pretext for retaliation. To show pretext sufficient to defeat summary judgment, Plaintiff must point to facts supported by direct or circumstantial evidence pursuant to which it could be rationally found "that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action". Tapia v. TWC Administration LLC, No. 17-CV-431 (KMK), 2018 WL 5016608, at *12 (S.D.N.Y. Oct. 16, 2018); see Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000); Jimenez v. City of New York, 605 F. Supp. 2d 485, 522 (S.D.N.Y. 2000) (evidence of pretext may be either direct or circumstantial, (citing Burdine, 450 U.S. at 256), but must, "taken as a whole, support[ ] a sufficient rational inference of discrimination," Weinstock, 224 F.3d at 42. "[I]t is not enough ... to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." St. Mary's Honor Ctr., 509 U.S. at 519 (emphasis omitted). More specifically, it now falls upon Plaintiff to show facts that would allow a reasonable jury to conclude that her complaint of discrimination was a reason for the counseling letter. In support of her pretext argument, Plaintiff notes again (as she may) that she was discriminated upon the basis of her EEOC Complaint and that her claim is borne out by the timeline.

Since Plaintiff has pleaded only a cause of action for retaliation based upon the 2016 Memo even after taking all discovery with respect thereto, this Court reaches the same conclusion as made in the pleadings phase. There, Plaintiff failed to plead a plausible claim of causation. See DE [38] (ruling on Defendant's motion to dismiss that "the terms of the counseling letter lay out multiple purported reasons for its issuance … For this reason, Plaintiff has failed to set forth a sufficient causal connection … with respect to the counseling letter"); see

34

also <u>Sanossian v. Valley Stream Central High School District</u>, No. CV 16-4697 (JMA) (AKT), 2020 WL 6385602, at *6 (Oct. 29, 2020) (ruling on Plaintiff's motion for leave to file an amended complaint that "between the ongoing interpersonal disputes involving Plaintiff and other multiple purported reasons listed in the counseling letter, Plaintiff may have been issued the counseling letter had she not filed the EEOC charge"). Now, it is clear that no reasonable jury could find in favor of Plaintiff as to the necessary element of causation.

Whether through a temporal or "but for" lens, Plaintiff has failed to plead facts sufficient to plausibly suggest that the 2016 Memo shares a causal connection with Plaintiff's EEOC charge of February 23, 2016 or the District's May 2016 knowledge thereof. To show causation through temporal proximity, the relevant case law makes clear that such a nexus must be very close in time to establish an inference of discrimination. See <u>Breeden</u>, 532 U.S. at 273; <u>Vega</u>, 801 F.3d at 90; <u>Pothen</u>, 211 F. Supp. 3d at 497.

Here, considering timeline alone, Plaintiff passes the summary judgment threshold. <u>See Suggs v. Port Auth. of New York & New Jersey</u>, No. 97 CIV. 4026, 1999 WL 269905, at *6 (S.D.N.Y. May 4, 1999); <u>but see Hollander v. American Cyanamid Co.</u>, 895 F.2d 80, 85-86 (2d Cir. 1990) (evidence that a defendant took an adverse employment action against the plaintiff three months after he filed his EEOC complaint was insufficient to establish a causal connection) <u>Carr v. Westlb Admin., Inc.</u>, 171 F. Supp. 2d 302, 310 (S.D.N.Y. 2001) ("With all due respect to the court in <u>Suggs</u>, this court disagrees with Suggs's holding that a period of six months constitutes, per se, a short enough period of time to imply causation.").

The timeline in this case alone, however, does not carry the day. Instead, after consideration of all of the facts developed during discovery, the Court concludes that no reasonable juror could find the required causation. The counseling letter was presented to

35

Plaintiff three and a half months after she filed her EEOC charge and approximately two months after receipt thereof. See Compl. ¶¶ 8, 50. The three and half month time span from Plaintiff's filing of the EEOC charge to the issuance of the 2016 Memo falls within the plausible realm for temporal proximity.

When taking Plaintiff's FMLA leave into account, Plaintiff's temporal proximity argument falls apart. Specifically, the 2016 Memo, while shortly following receipt of Plaintiff's EEOC Complaint, is dated shortly after Plaintiff's return from her FMLA leave. There is more than good reason to believe deposition testimony that the District does not counsel employees while they are out on FMLA leave and would not call an employee in from such leave in order to conduct an in-person meeting. Thus, the District waited for Sanossian's return from her FMLA absence to communicate the findings of their investigation regarding accusations that she harassed her co-workers.

Even accepting that Plaintiff has established sufficient temporal proximity, "temporal proximity is not enough on its own to establish that a retaliatory motive was the but for cause of the adverse action." Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 254 (2d Cir. 2014). Here, Plaintiff is unable to meet her burden through a necessary "but for" analysis. "As part of the causation analysis, a plaintiff must show that the retaliatory action was a 'but-for' cause of the employer's adverse action." Vega, 801 F.3d at 90. The Complaint and the documents incorporated in it portray an ongoing interpersonal dispute between Plaintiff and the Individual Defendants, among others. The dispute pre-dates the EEOC charge by almost two years -- when Plaintiff stepped down from her position as Chairperson of the Social Studies Department. See Compl. ¶ 24. In this context, Plaintiff is unable to show that she would not have been presented with the 2016 Memo but for her EEOC charge. Indeed, the terms of the counseling letter lay out

multiple purported reasons for its issuance. Further, Plaintiff does not cite to any additional harassment or evidence stemming from the EEOC charge. Plaintiff also does not dispute the evidence of an ongoing interpersonal dispute dating back at least two years prior to the EEOC charge nor does Plaintiff dispute that dating back to 2010, Plaintiff was spoken to by Odell and Parisi on at least five occasions. The substance of the memo makes clear that it was issued after Odell met with Sanossian to discuss the investigation that followed the sexual harassment complaints of several co-workers that were made in 2015 - over a year before Sanossian's EEOC Complaint was received by the District. The 2016 Memo refers not only to the findings of the District's investigation of complaints against Sanossian, but also to Sanossican's October 2015 interview in connection therewith.

Viewed in the aggregate, the progression of verbal directives over the years culminating with the 2016 Memo, compels the conclusion that no reasonable factfinder could infer a causal connection between the protected activity and the 2016 Memo. Given these circumstances, there is no question but that Plaintiff would have been issued the memo even if she had not filed her EEOC charge. For this reason, Plaintiff has failed to set forth a sufficient causal connection to successfully plead a Title VII retaliation claim with respect to the 2016 Memo.

## CONCLUSION

For the foregoing reasons, this Court respectfully recommends that Defendant's motion for summary judgment, appearing as Docket Entry No. 90 herein, be granted.

## OBJECTIONS

A copy of this Report and Recommendation is being provided to all counsel via ECF. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of filing of this report.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

6(a), 72(b).  Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals. Thomas v. Arn, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision").

Dated: Central Islip, New York
       February 16, 2022

                                                    /s/ Anne Y. Shields
                                                    Anne Y. Shields
                                                    United States Magistrate Judge